KING, EXECUTRIX, ET AL. *v.* UNITED STATES.

No. 16.   Argued October 19, 1964.—Decided December 14, 1964.

*David S. Bate* argued the cause for petitioners. With him on the brief was *Paul T. Murphy.*

*Alan S. Rosenthal* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Douglas, Hadley W. Libbey* and *Frederick B. Abramson.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This is an action brought by the United States against the executrix of George King,[1] a deceased distributing agent for a debtor in a Chapter XI proceeding, and against his surety. The Government alleged that King was personally liable under R. S. § 3467, 31 U. S. C. § 192 (1958 ed.), because he satisfied claims of nonpriority creditors with knowledge of an outstanding government priority claim, in consequence of which the Government could not be paid in full.

The facts of the case were stipulated and are essentially as follows. On October 1, 1946, Seeley Tube &

---

[1] King died testate after commencement of the suit and his executrix was substituted as a party defendant by court order. An action by the United States against a fiduciary under R. S. § 3467, 31 U. S. C. § 192 (1958 ed.), survives against his estate. See *United States.* v. *Dewey,* 39 F. 251.

Box Company, Inc., a New Jersey corporation, filed a petition for reorganization under Chapter XI of the Bankruptcy Act, 30 Stat. 563, as amended, 52 Stat. 905. Soon thereafter, the United States notified Seeley that it intended to terminate, because of Seeley's default, two federal contracts between Seeley and the Picatinny Arsenal, an installation of the War Department of the United States; the Government further signified its purpose to relet the contracts and to hold Seeley liable for any excess costs. On March 17, 1947, the referee appointed King, who was Seeley's president, as distributing agent and accepted his surety bond for $10,000. On March 21, 1947, after a hearing, a plan of arrangement submitted by Seeley was confirmed; the Government was not listed as a creditor in Seeley's petition, but the Picatinny contracts were noted in an annexed schedule as executory. The plan called for Seeley, the debtor corporation, to deposit with the distributing agent $160,193.68 to be distributed pursuant to orders of the court by checks signed by the distributing agent and countersigned by the referee. The plan contained no written provision for payment of the Government's as yet unliquidated and unfiled claim.

At the hearing, the following colloquy took place between the referee and Mr. Freeman, counsel for Seeley:

"The Referee. Is there a claim of the Picatinny Arsenal?

"Mr. Freeman. The Picatinny Arsenal may have some claim.

"The Referee. Have we put up enough money to meet it?

"Mr. Freeman. No.

"The Referee. Is there a problem there?

"Mr. Freeman. We do not owe them any money, and we want to bring them in. I want to st 'e to your Honor further that the debtor company will

deposit any sum of money that is represented by any claim that the Picatinny Arsenal may file in these proceedings within a time that your Honor directs them to file it.

"The Referee. Have you any notion of what they might claim?

"Mr. Freeman. We think they may claim $20,000.

"The Referee. Have you $20,000 available?

"Mr. Freeman. We have $94,000 available to pay them if necessary, and we represent to your Honor that there will be at all times $20,000 or more available to dispose of that claim, in cash . . . ."

The record shows that King was present in the courtroom on the day of the hearing.

Thereafter the court entered an order directing the Government to file its claim on or before May 9, 1947. On May 9 the Government duly filed its preliminary contingent proof of claim in the amount of $26,818.82, later amended to $34,125.03, alleging a priority under § 64 of the Bankruptcy Act, 11 U. S. C. § 104 (1958 ed.), and R. S. § 3466, 31 U. S. C. § 191 (1958 ed.). However, in the seven weeks between the hearing and the filing of this claim, King, as distributing agent, had paid out by checks duly countersigned by the referee, all but $6,085.01 of the $160,193.68 deposited with him; $42,829.76 was paid to King himself as a creditor of the company.[2]  A long litigation then commenced on the issue of whether the Government had timely filed its claim, with an ultimate determination being made in January 1955, in favor of the Government by the Court of Appeals for the Third Circuit.  The court stated, "The disclosure by the debtor at the referee's hearing on confirmation of the plan that

---

[2] This fact was not stipulated, but appears in King's final petition and report, which was attached as Exhibit A to the Government's complaint.  See Brief for Respondent, p. 7, n. 4.

the Government had become a creditor was . . . in performance of its duty under the Act and amounted to an informal amendment of the list of creditors included in the debtor's schedules." *In re Seeley Tube & Box Co.,* 219 F. 2d 389, 391, cert. denied, 350 U. S. 821.

After King had distributed the $6,085.01 which still remained in his hands ($3,620.39 had gone to the United States) he filed his final report and account. On August 2, 1956, the Bankruptcy Court approved them and discharged King and his surety.[3]

On July 3, 1958, the United States commenced this suit against King[4] for $25,831.08, the balance outstanding on the claim as finally determined, and against the surety for $10,000. The Government's contention was that King incurred personal liability under § 192 for the unpaid amount by paying the claims of the debtor's non-priority creditors and thereby so depleting the debtor's assets that the Government's § 191 priority claim could not be paid in full. Section 192 provides:

> "Every executor, administrator, or assignee, or other person, who pays, in whole or in part, any debt due by the person or estate for whom or for which he acts before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate to the extent of such payments for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

The District Court dismissed the complaint on the theory that a distributing agent is not included within § 192 as an "executor, administrator, or assignee, or other person"

---

[3] It was alleged in the Government's complaint in this action that it received no notice of these events, but this allegation was denied in the answer and is not mentioned in the stipulated facts.

[4] See note 1, *supra.*

because he, unlike those fiduciaries mentioned specifically in the statute, is not a personal representative of the debtor but an arm and a representative of the bankruptcy court. 208 F. Supp. 697. The decision was reversed on appeal, 322 F. 2d 317, and, because of a conflict among the circuits on the proper interpretation of § 192,[5] we granted certiorari, 375 U. S. 983.

## I.

Section 191,[6] which establishes government priorities on any debts owed by an insolvent debtor to the United States, and § 192, which gives assurance that such debts will be paid, are part of a single statutory structure. The precursor of § 191 first appeared in 1789 in an act establishing customs duties (1 Stat. 29, 42). Section 21, relating to collection on bonds for the payment of duties, provided: "[A]nd in all cases of insolvency, or where any estate in the hands of executors or administrators shall be insufficient to pay all the debts due from the-deceased, the debt due to the United States on any such bonds shall be first satisfied." In 1792 the Government's priority was extended to voluntary assignments for the benefit of

---

[5] Compare *United States* v. *Stephens,* 208 F. 2d 105 (C. A. 5th Cir. 1953), with *United States* v. *Crocker,* 313 F. 2d 946 (C. A. 9th Cir. 1963) and the decision of the court below in the present case.

[6] Section 191 provides:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

creditors and to attachments of the property of "absconding, concealed or absent" debtors as well as to cases in which "an act of legal bankruptcy shall have been committed," § 18, 1 Stat. 263. Prior to passage of the Act of 1797, "An internal revenue had been established, and extensive transactions had taken place; in the course of which, many persons had necessarily become indebted to the United States." *United States* v. *Fisher,* 2 Cranch 358, 392. By the Act of 1797, the section was extended to cases involving "any revenue officer, or other person hereafter becoming indebted to the United States, by bond or otherwise." 1 Stat. 515. See *Price* v. *United States,* 269 U. S. 492, 501. Then, in 1799, Congress took the step which concerns us here by adding the provision now embodied in § 192, establishing personal liability for those who frustrated the Government's priority:

> ". . . and in all cases of insolvency, or where any estate in the hands of the executors, administrators or assignees, shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States, on any such bond or bonds, shall be first satisfied; and any executor, administrator, or assignees, or other person, who shall pay any debt due by the person or estate from whom, or for which, they are acting, previous to the debt or debts due to the United States from such person or estate being first duly satisfied and paid, shall become answerable in their own person and estate, for the debt or debts so due to the United States, or so much thereof as may remain due and unpaid . . . ." 1 Stat. 676.

Later, in the same section, the proviso extending the statute to voluntary assignments and absconding debtors is also included.

Division of the provisions into separate sections in the Revised Statutes "did not work any change in the purpose or meaning." *Price* v. *United States,* 269 U. S. 492, 501. Thus, it is evident that §§ 191 and 192 must be interpreted *in pari materia.* The Court so stated in *United States* v. *Butterworth-Judson Corp.,* 269 U. S. 504, 513, and so interpreted them in *Bramwell* v. *United States Fidelity & Guaranty Co.,* 269 U. S. 483, where it said:

> "The specification in § 3466 [§ 191] of the ways insolvency may be manifested is aided by the designation in § 3467 [§ 192] of the persons made answerable for failure to pay the United States first from the inadequate estates of deceased debtors or from the insolvent estates of living debtors. The persons held are 'every executor, administrator, or assignee, or *other person.*' The generality of the language is significant. Taken together, these sections mean that a debt due the United States is required first to be satisfied when the possession and control of the estate of the insolvent is given to any person charged with the duty of applying it to the payment of the debts of the insolvent, as the rights and priorities of creditors may be made to appear." 269 U. S., at 490.

## II.

Petitioners, in oral argument, conceded the Government's priority claim under § 191. Their contention, relying on *United States* v. *Stephens,* 208 F. 2d 105, is that distributing agents as a class are nonetheless excluded from the category of fiduciaries covered by § 192 because they are agents of the court rather than personal representatives of the debtor, and the words "or other person" are "limited to those who stand as personal representatives [of the debtor] not only by the application of the principle of *ejusdem generis* but by the language qualify-

ing 'person' as óne 'who pays in whole or in part any debt *due by the person or estate for whom or for which he acts.'* " *Id.,* at 108.

Petitioners' emphasis on a distinction between a personal representative and an agent of the court is misplaced in the context of §§ 191 and 192. The purpose of § 192, as recognized in *Bramwell,* is to make those into whose hands control and possession of the debtor's assets are placed, responsible for seeing that the Government's priority is paid. Whether or not King falls within the category of fiduciaries on whom such responsibility should be placed depends, not on the title of his position or the mode of his appointment, but, in practical terms, upon the degree of control he is in a position to assert over the allocation among creditors of the debtor's assets in his possession. That appointment as an officer of the court does not decisively inhibit operation of § 192 is shown by the express inclusion within the scope of the statute of court-appointed administrators.[7] And *Bramwell* showed that others besides personal representatives of the debtor may be included in § 192, for in that case this Court indicated that § 192 would apply to a state official charged with the function of liquidating a bank's assets, although the official was clearly not acting as the personal representative of the bank. Petitioners would distinguish *Bramwell* in that the state official had a large measure of control, whereas King did not,[8] but this, on the one hand, does not vitiate the point that one need not be a personal representative to come within the coverage of § 192, and, on the other, emphasizes that it is the element of control over the assets which is decisive.

---

[7] A trustee in bankruptcy, an officer of the court, has been included as an "other person," *United States* v. *Kaplan,* 74 F. 2d 664.

[8] See *United States* v. *King,* 322 F. 2d 317, at 322.

We agree with Judge Browning, writing in *United States* v. *Crocker*, 313 F. 2d 946, 949, that "the debts paid by a liquidating receiver [and, we add, distributing agent], like those paid by an executor, administrator, or assignee for the benefit of creditors, are primary obligations of the debtor; the phrase 'for whom, or for which he acts' should be read as a general acknowledgment of this fact rather than as imposing a restriction upon the reach of Section 192 inconsistent with the overall purpose of this section and Section 191." We reject, therefore, the proposition that because distributing agents in Chapter XI proceedings act primarily for the court rather than for the debtor they are categorically excluded from the coverage of § 192.

## III.

It remains to inquire whether King, by acting as an arm of the court under court instruction and approval lacked the degree of control necessary to make § 192 operative as to him. Petitioners argue that distributing agents exercise no discretion in the discharge of their duties, but perform only the ministerial function of paying out the deposited funds in conformity with the court's orders. Indeed, it is contended that inclusion of distributing agents within the coverage of § 192 would have placed King on the horns of a dilemma, in that he must either have incurred personal liability to the Government or risked being held in contempt by the Bankruptcy Court. But this assumes that the plan of arrangement, once submitted to the court, was immutable. In fact, if King had objected at the confirmation hearing to paying out the deposited funds to nonpriority creditors before the Government's claim was surely provided for, there can be little doubt that he would have obtained satisfaction.[9]

---

[9] See generally 8 Collier on Bankruptcy, ¶ 5.33 (14th ed. 1963).

Even after confirmation it is most unlikely that such an objection would have been ignored. Had it been, responsibility for the frustration of the Government's claim would have devolved completely upon the court, and we would be faced with a very different case.

We are not prepared to articulate any general rule defining the responsibility of distributing agents to make and press such objections. We hold only that King, on the facts of this case, did have such a responsibility.[10] As president of the debtor corporation he must have been aware of the Government's potential claim; most likely he took an active role in the formulation of the plan of arrangement which appended a reference to the Picatinny contracts. He had been appointed distributing agent before the day of the confirmation hearing, and was present in court on that day. In all likelihood, he was present at the time when the possibility of the government claim arose and Mr. Freeman, the company's counsel, made the representation that $94,000 was available to meet it. Finally, he himself was one of the major distributees in the distribution plan. In these circumstances we think King was possessed of a sufficient degree of control over the allocation among creditors of the assets in his possession to give rise to responsibility under § 192 for seeing that the government priority was paid, a responsibility which King, so far as the record reveals, made no effort to discharge. This is not to say that King acted dishonestly in any way or that he positively intended to thwart the Government's claim. He may well have relied either on the representation that $94,000 was available, or, as president of the corporation with full knowledge of its finances, on whatever underlying facts led Mr. Freeman to make that representation. But § 192

---

[10] Cf. *Field* v. *United States*, 9 Pet. 182 (1835).

required more of King than an honest belief that the Government would be paid. It imposed upon him a duty to see that this was done.

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS share the views of the Court of Appeals for the Fifth Circuit, *United States* v. *Stephens,* 208 F. 2d 105, as to the construction of the statute, and would therefore reverse the judgment below.

MR. JUSTICE WHITE, concurring.

In the typical Chapter XI case initiated by the debtor under § 322 it is the debtor that remains in possession and that has prepared and filed the petition and schedules and that proposes the arrangement. It is only after the arrangement has been approved by the creditors that a distributing agent is appointed and charged with the distribution to specified recipients of the deposit required by the Act. The agent, *qua* agent, has no reason or duty to know or to learn of unscheduled debts, priority or otherwise, and lacking such knowledge from·some other source such as his prior or current position with the debtor I would think he would be beyond the reach of 31 U. S. C. § 192 (1958 ed.) if a government priority claim is unscheduled and unpaid.*

---

*Even if a distributing agent does learn of the government claims it may be that he should not be held liable under § 192, if such knowledge is not obtained until after confirmation. As the claim was neither scheduled nor filed prior to confirmation the Government would not be entitled to share in the deposit and a disbursement from the deposit to the United States would probably subject the distributing agent to liability to creditors entitled to share in the composition. *In re J. B. Pollak Co.,* 86 F. 2d 99. Only if the confirmation were set aside prior to distribution of the deposit, which normally occurs immediately, could provision be made to pay the government claim. In this respect it should be noted that the Court's observation that

But the agent does have the task of distributing the deposit and the deposit is required to include a sufficient sum to pay all priority claims (with some exceptions), even those which are scheduled as disputed and unliquidated. Bankruptcy Act, § 337 (2), 11 U. S. C. § 737 (2) (1958 ed.); 8 Collier on Bankruptcy, ¶ 5.33 [2], at 696 (14th ed. 1963). His responsibility under Chapter XI and under 31 U. S. C. §§ 191 and 192 extends far enough to impose the obligation to ascertain that the deposit he is handling is ample to pay the claims specified in the statute and is disbursed as required by law. And as to scheduled claims, liquidated or not, disputed or undisputed, the distributing agent is furnished with sufficient knowledge to fasten upon him the responsibility of not paying out the deposit so as to defeat the priority of the Government under § 191, at least without a court determination that he should do so.

There remains, however, a difficulty in this case. Although the papers filed with the petition revealed the debtor had certain contracts with the Government, the schedules did not list the United States as a creditor. However, the Government later terminated the contracts and at the confirmation hearing the existence of a claim of the United States was made known. The referee himself brought up the question of providing for payment of the Government's claim and was told, as I read the testimony, that the deposit did not include any sum to defray any part of this claim but that the debtor would have ample sums available to satisfy the claim and would make any deposit for this purpose which it was directed to

---

even if King had waited to object "to paying out the deposited funds to nonpriority creditors before the Government's claim was surely provided for" until after confirmation "it is most unlikely that such an objection would have been ignored," *ante*, pp. 338, 339, while perhaps true on the particular facts of this case, is greatly oversimplified if meant to apply to the distributing agent's position generally.

make. The debtor's attorney, however, made it clear that the debtor was disputing the claim of the United States. In effect, the situation at that point was as though a disputed and unliquidated claim had been scheduled. *In re Seeley Tube & Box Co.*, 219 F. 2d 389, cert. denied, 350 U. S. 821. An arrangement may not be confirmed if a deposit does not include an amount to take care of all scheduled priority claims including those which are unliquidated. 8 Collier on Bankruptcy, ¶ 5.32 [8]. If the referee, as he apparently did here, confirmed the arrangement without having in hand a deposit to pay the debt to the Government if proved and allowed, it could well be argued that a distributing agent should not be required to have remonstrated with the referee or to bear the burden of the referee's unauthorized act, for the distributing agent's "control and possession" are limited to the deposit.

We need not pursue this phase of the matter further, however, since other facts justify holding the distributing agent accountable in this particular case. As the Court points out, the agent was an officer of the debtor, was undoubtedly familiar with its affairs and took no exception to the attorney's statement that there would be ample funds to pay the government claim. This petitioner was not an uninformed distributing agent doing only what he was told to do but was both a distributing agent and an officer of the debtor, with ample notice of the Government's claim and of the referee's expectation that when proved and allowed it would be paid. In paying out the deposit without provision for the claim of the United States he acted at his own risk and became personally liable under § 192 when the Government's claim became liquidated.